J-A28038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :--- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SEAN JOSE RAIN, JR. | : | |
| | : | |
| Appellant | : | No. 407 WDA 2020 |

Appeal from the Judgment of Sentence Entered September 4, 2019
In the Court of Common Pleas of Mercer County Criminal Division at
No(s):  CP-43-CR-0001331-2018

BEFORE:  OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED: MARCH 12, 2021**

Sean Jose Rain, Jr. (Appellant) appeals from the judgment of sentence entered in the Mercer County Court of Common Pleas, following his jury convictions of murder in the first degree[1] and related offenses.  He avers:  (1) the trial court erred in precluding evidence that the victim had a feud with another person, which in turn prohibited him from developing an alternative suspect defense; and (2) the circumstantial evidence was insufficient to sustain his murder conviction.  We affirm.

---

[1] 18 Pa.C.S. § 2502(a).  The jury also found Appellant guilty of firearms not to be carried without a license, 18 Pa.C.S. § 6106(a)(1).  Additionally, the trial court found him guilty of person not to possess a firearm, 18 Pa.C.S. § 6105(c)(7).

The trial court aptly summarized the evidence presented at trial:[2]

On June 23, 2018, [at approximately 3:00 A.M.,] the Sharon Police Department was dispatched to a shots fired call in the [100 block[ ] of South Myers Ave. in the City of Sharon, Pennsylvania. Upon arrival, officers discovered a deceased male identified as Trivoune R. Craig (hereinafter "Victim") seated in the front driver seat of his own car. Victim had sustained multiple gunshot wounds to his face[. N.T. Jury Trial, Day 2, 6/12/19, A.M. session, at 26.]

[Antonio] Volpe resides at 54 South Myers Avenue and testified that . . . he woke up around 2:42 a.m. to [three or four] gunshots on the day of the incident. Mr. Volpe went to his living room and looked out his living room's window to see Victim's vehicle across the street with its lights on. Mr. Volpe [walked] outside on to his front porch and called out and asked if everyone was okay. No one responded. . . . Mr. Volpe called 911 to report the incident. The Commonwealth admitted into evidence Mr. Volpe's 911 call. During [the] 911 call, Mr. Volpe stated he heard voices arguing before the gunshots went off. [N.T. Jury Trial, Day 1, 6/11/19, P.M. session, at 34-35, 37-38.]

Trial Ct. Op., 5/11/20, at 4.

Appellant's aunt, Ashley West, and her paramour, Donta Bell, lived at 70 South Myers Avenue, which was two "houses apart from" Volpe's residence at 54 South Myers Avenue. Trial Ct. Op. at 5. The trial court summarized their trial testimony:

Mr. Bell testified that on the day of the incident he was downstairs playing video games when he heard two (2) gunshots in the early morning hours. Mr. Bell [went] upstairs to check that Ms. West and her son [were] okay. Upon returning downstairs, Mr. Bell heard a knock at his door. Mr. Bell then peeked through the peephole to see Appellant standing outside. Mr. Bell opened

---

[2] For ease of review, we have repositioned the trial court's citations to the transcripts to the end of each paragraph.

the door and Appellant walked right in without saying anything to Mr. Bell. [N.T. Jury Trial, Day 3, 6/13/19, P.M. session, at 9-12.]

After walking into Mr. Bell's residence, . . . Appellant immediately walked back towards the kitchen area. Mr. Bell asked Appellant "what's going on." Appellant responded, "it's cool, Unc." Mr. Bell then testified:

. . . I was like what's cool? And he was like nothing, you know what I mean. And then we exchanged some words. I asked what was going on, and he was like nothing. Like basically just be like shush, why are you talking so loud. You know what I mean?

[N.T. Jury Trial, Day 3, P.M. session, at 12-13.]

As Mr. Bell was walking away from Appellant, Appellant made a comment about someone disrespecting Appellant's cousin Bubby. Bubby had been murdered sometime in the past and Appellant was extremely close to him. Mr. Bell then went upstairs and told Ms. West that she had to go downstairs and talk to Appellant. [N.T. Jury Trial, Day 3, P.M. session, at 14-17.]

Ms. West testified that she awoke in the early morning hours on the day of the incident to a commotion. [W]hen she first talked [to] Mr. Bell, Mr. Bell "seemed a little frantic, like something was wrong." Ms. West . . . observed Appellant inside her . . . kitchen. Appellant then went to the laundry room, took off his clothes, including blue jeans, put them in the washing machine, and added detergent and bleach. [N.T. Jury Trial, Day 3, 6/13/19, A.M. session, at 86-87, 89-90.]

. . . Appellant stated to Ms. West "something along the lines of somebody being gone." After Appellant . . . put [his clothes] in the washing machine, Appellant retrieved a bag from Ms. West's residence that he kept there that had clothes in it. Appellant then put on the clothes and went up into Ms. West's attic. Ms. West's attic has no bed but does have a window where Appellant could look directly at the crime scene below. [N.T. Jury Trial, Day 3, A.M. session, at 93-94, 96, 115.]

After Appellant was up in the attic, a Sharon Police Officer knocked on Ms. West's door [and asked] if she had heard anything. Ms. West informed the Sharon Police Officer that she

did not hear anything. Additionally, Ms. West testified that Appellant was "very close" to their cousin Bubby who had been shot to death. [N.T. Jury Trial, Day 3, A.M. session, at 96, 98-99, 104-05.]

[Ms. West testified that e]arly the next morning, . . . she woke up Appellant and told him it was time for him to leave. Appellant called a friend and was subsequently picked up. Ms. West . . . saw Appellant carry his bag of clothes with him as [he] left . . . . Ms. West . . . did not know exactly what was inside the bag. [N.T. Jury Trial, Day 3, A.M. session, at 116-17.]

Trial Ct. Op. at 5-7.

Subsequently, the police searched West and Bell's house and discovered drugs and a 9 mm Taurus gun that was licensed to West. N.T. Jury Trial, Day 3, A.M. session, at 99. Both witnesses "were given immunity for their testimony and there was also an agreement not to pursue any charges against Mr. Bell or Ms. West." N.T. Jury Trial, Day 3, A.M. session, at 118.

The Commonwealth also presented the testimony of three individuals who were with Appellant and Victim on the night of the shooting at TnT Bar in Farrell, Pennsylvania.

[Kaleb] Shorts testified [he was at TnT Bar with] Appellant, Victim, [Daniel] Wiley, and [Isaiah] Abram[, and they all] eventually . . . were hanging outside [sic] rapping. . . . TnT Bar was closing, and Mr. Abram was the first person to leave the group by getting picked up. . . . Victim . . . retrieve[d] his vehicle[, drove to the] front of TnT Bar[ and] asked if anybody needed a ride home. Mr. Shorts . . . declined but Appellant and Mr. Riley got into Victim's vehicle. [N.T. Jury Trial, Day 2, 6/12/19, P.M. session, at 5, 7-9.]

Mr. Abram is Victim's cousin. Mr. Abram testified that [w]hen TnT Bar was closing, . . . Victim and he went outside and were hanging out with Appellant and Mr. Wiley. . . . Mr. Abram [and Appellant] were rap battling each other and during the rap battle, Appellant lifted his shirt with his arm to expose a dark object

- 4 -

located in Appellant's waist area. When Appellant let his shirt fall back down, Mr. Abram could no longer see the same dark object. Mr. Abram testified that he was picked up by his girlfriend and went home. [N.T. Jury Trial, Day 2, P.M. session, at 60-65.]

Mr. Wiley testified that he was at TnT Bar around the time it closed with Appellant, Victim, and Mr. Abram. When it was time to leave, Mr. Wiley . . . got into the Victim's vehicle to get a ride home. [Appellant] started talking to Victim and [then entered] the backseat[.] Victim dropped off Mr. Wiley[, who lived] very close to TnT Bar. Upon Mr. Wiley exiting Victim's vehicle, Appellant got in the front seat[. N.T. Jury Trial, Day 2, P.M. session, at 27-30, 32.]

Trial Ct. Op. at 7-9.

The Commonwealth also presented several surveillance videos:

TnT Bar provided surveillance video from multiple camera angles which were shown to the jury. One [video showed] Appellant interacting with various people. [Sharon Police Department Captain Travis] Martwinski testified that Appellant was exhibiting signs of printing[, which he explained was "carrying a concealed firearm." Captain Martwinksi explained, verbatim:]

> When [Appellant] hugs the one girl, he does use his right hand, but he's out[,] butt away. He goes and talks to the person and he's butt away, keeps that gun away. When he walks through the crowd, he walks his elbow. Kind of go through so that they don't bump the gun or he — if it's a gun, protecting that firearm.

[N.T. Jury Trial, Day 2, P.M. session, at 79, 81-82, 100, 105-06.]

Furthermore, Captain Martwinski testified that the surveillance video inside TnT Bar showed Appellant with a large bulge in his waistband on the right side of his shirt. [N.T. Jury Trial, Day 2, P.M. session, at 104.]

[An exterior] surveillance video obtained from TnT Bar . . . captured Appellant, Victim, Mr. Wiley, Mr. Abram, and Mr. Shorts standing around. It also displayed Victim leaving and then Victim's vehicle appear[ing] on the screen [at 2:29 a.m.] with Appellant, Mr. Wiley, and Mr. Shorts still hanging out. [At 2:30,]

> Victim's vehicle leaves the TnT Bar area. [N.T. Jury Trial, Day 2, P.M. session, at 86-88, 90-91.]

Trial Ct. Op. at 9-10.

Additionally, two surveillance videos from the Farrell library, located one block from TnT Bar, showed Victim's car at 2:30 and 2:31 a.m. Trial Ct. Op. at 10, *citing* N.T. Jury Trial, Day 2, P.M. session, at 106-11. Two more surveillance videos from a dry-cleaning store showed Appellant's vehicle at 2:39 a.m. ***Id.*** at 10-11, *citing* N.T. Jury Trial, Day 2, P.M. session, at 113-16. Finally,

> [a] video was recovered from a private resident at 189 South Myers Avenue. This camera angle looked down South Myers Street and showed the Victim's vehicle make a five (5) point turn to go north on South Myers Street. The time stamp of this video was 2:42 in the morning. [N.T. Jury Trial, Day 2, P.M. session, at 123, 126-28.]

Trial Ct. Op. at 11.

Appellant was detained, and on June 24, 2020 — the day after the shooting — police administered a gun residue test, N.T. Jury Trial Day 3, P.M. session, at 49, 51, which indicated the presence of gunshot residue on both of Appellant's hands. Trial Ct. Op. at 11, *citing* N.T. Jury Trial Day 3, P.M. session, at 105. Appellant was charged with, *inter alia*, criminal homicide, persons not to possess a firearm, and carrying a firearm without a license.

On May 10, 2019, the Commonwealth filed a pre-trial motion *in limine*. It explained:

> [A]fter Victim's murder, Victim's wife . . . informed Sharon Police Department that about three (3) to four (4) months prior to

> Victim's death, their house [at 508 Emerson Avenue] was shot at. [N]o one reported the incident to the police when it occurred, and no one was ever charged with the shooting. Sharon Police [recovered] a bullet slug from a cabinet in Victim's house[, which] did **not** match the bullets that killed Victim.

Trial Ct. Op. at 13 (emphasis added). The Commonwealth sought to preclude any reference to this incident, arguing it was not relevant, it was overly prejudicial, and it would be confusing to the jury. *Id.* at 12.

The trial court conducted a hearing on June 5, 2019. The parties referred to a report, in which "an individual named Mr. Crawford" told police "he[3] was having issues with another individual[, who] apparently had shot at him in the recent past."[4] N.T. Motion *In Limine*, 6/5/19, at 9. Appellant further stated that Mr. Crawford

> name[d] an individual with whom . . . the decedent had been having issues as of late and that . . . individual had shot at him recently. I don't know if he's referring specifically to this event, although it certainly appears to be[.[5]]

*Id.* Appellant also cited a report — it is unclear whether it is the same report concerning Mr. Crawford, above — that Victim "had been having an ongoing

_____

[3] It is not clear whether Crawford told police he himself had an issue with another person, or whether Victim had an issue with another person. *See* N.T. Motion *In Limine*, 6/5/19, at 9.

[4] On appeal, Appellant states Timothy Crawford is Victim's cousin. Appellant's Brief at 15.

[5] It is not clear whether the person who had a feud with Victim was the same person who had a feud with Crawford.

issue with" someone named Zach Owens. *Id.* at 11. Appellant argued he should be permitted "to explore other suspects" who were not investigated for "very recent past . . . attempts on [V]ictim's life." *Id.* at 9. The Commonwealth responded that although, following Victim's death, there were "a couple names thrown out as to who may have had problems with [V]ictim," nothing tied any of those names to the shots fired at Victim's house. *Id.* at 13.

The trial court agreed with the Commonwealth. Two days after the hearing, on June 7, 2019, the trial court granted its request to preclude any evidence relating to the shots fired at the Victim's house. However, the court provided it would admit such evidence if Appellant could "establish a factual or evidentiary foundation that" the prior incident was relevant to the instant case. Trial Ct. Op. at 14, *citing* Order, 6/7/19.

Four days following the trial court's order, on June 11, 2019, a five-day jury trial commenced. The Commonwealth presented the testimony and evidence and summarized above. Appellant did not testify. The jury found Appellant guilty of murder in the first degree and firearms not to be carried without a license. Separately, the trial court found him guilty of person not to possess a firearm.

On September 4, 2019, the trial court sentenced Appellant as follows: (1) life imprisonment without parole for the murder count; (2) a consecutive 42 to 84 months' imprisonment for carrying a firearm without a license; and

(3) a concurrent 18 to 36 months' imprisonment for persons not to possess a firearm.

On September 13, 2019, Appellant, who was still represented by his trial counsel, Stephen Colafella, Esquire, filed a timely post-sentence motion. He: (1) challenged the sufficiency and weight of the evidence; and (2) requested leave to file a supplemental motion after he received the trial and sentencing transcripts. The trial court granted Appellant 10 days from receipt of the transcripts to file a supplemental motion. Appellant received the transcripts on December 2, 2019, but, not having not filed any supplemental motion, the trial court denied his motion on December 18th. Order, 12/18/19, at 1.

Present counsel, Chris Eyster, Esquire, entered his appearance and, on January 10, 2020, filed a motion to vacate the order denying Appellant's post-sentence motion. Counsel also requested leave to file an amended or supplemental post-sentence motion. The court granted this relief, and on February 14th, Appellant filed a post-sentence motion, claiming, *inter alia*, the trial court erroneously precluded him from introducing evidence relating to the shots fired at Victim's house three to four months before the shooting in this matter. Appellant reasoned "it was uncontroverted that [Victim's] house was shot up recently and the police received information that [Victim] had problems with other individuals," and these "facts made it more probable that [Victim] was killed by the individual[s] who shot up his house." Appellant's Post Sentence Motions, 1/10/20, at 4. Additionally, Appellant asserted the

evidence was insufficient to establish murder in the first degree and the firearms offenses, where there were no eyewitnesses nor direct evidence, and instead the Commonwealth's case "was highly circumstantial."[6] *Id.* at 8.

_____

[6] We note Appellant's post-sentence motion also claimed the trial court erred in precluding evidence that Victim "was a convicted criminal and drug dealer and that he had marijuana on his person at the time of the murder." Appellant's Post Sentence Motions at 5. Appellant, however, has abandoned this issue on appeal.

Appellant's post-sentence motion also averred the court erred in denying his "request for special [jury] instructions concerning the" weight to be given to West's and Bell's trial testimony, where they had received immunity for their testimony. Appellant's Post Sentence Motions 7. Appellant raises this claim within his discussion of his first issue on appeal — the preclusion of evidence relating to gunshots previously fired at Victim's house. Appellant's Brief at 14. However, he provides no legal authority in support. *See* Pa.R.A.P. 2119(a); *Commonwealth v. Martz*, 232 A.3d 801, 811 (Pa. Super. 2020) (appellate arguments that are not appropriately developed, and that do not cite any authority in support of a contention, may be waived). Additionally, as the Commonwealth points out, Appellant raised no objection to the jury instructions after they were given. *See* Commonwealth's Brief at 32, *citing* *Commonwealth v. Sanchez*, 82 A.3d 943, 978 (Pa. 2013) ("[I]n the criminal trial context, the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points."). *See also Commonwealth v. Knight*, 241 A.3d 620, 634 (Pa. 2020) (Pennsylvania Rule of Criminal Procedure 647(C) "provides: 'No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate.' . . . As Appellant did not challenge the trial court's jury instructions or the verdict slip before the jury retired to deliberate, he has waived his challenge[.]"). On these bases, this issue is waived.

The trial court denied Appellant's motion on February 20, 2020. Appellant filed a timely notice of appeal on March 16th, and subsequently a court ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

Appellant presents two issues for our review:

I. Whether the trial court erred in granting the Commonwealth's motion *in limine* and prohibiting . . . Appellant from presenting an alternative suspect defense?

II. Whether the evidence was insufficient to sustain the murder conviction?

Appellant's Brief at 1.

Appellant's first claim is that the trial court erred in granting the Commonwealth's motion *in limine* to preclude evidence relating to the incident of gunshots fired at Victim's house, occurring three to four months prior to Victim's murder. Appellant reasons the court's evidentiary ruling prohibited him from fully developing an alternative suspect defense at trial — that "because another person may have committed the crime, there exists a reasonable doubt that this defendant committed the crime." Appellant's Brief at 8. Appellant alleges the "uncontroverted" fact that Victim's "house was shot up recently," along with information given to police that Victim "had problems with other individuals, . . . made it more probable that [Victim] was killed by the individual[s] who shot up his house." *Id.* at 11. Appellant adds

"at least two specific individuals (Zack Owens and Meco Brown[7]) were identified as suspects [in] the prior shooting," and furthermore that "a Mr. Crawford indicated '[t]hat [Victim] had been having an ongoing issue with a . . . Zack Owens.'" ***Id.*** at 10, *citing* N.T. Motion *in Limine* at 11. Appellant also contends that although Victim did not report the prior incident to police, Victim's wife "obviously believed there was a connection between the prior incident and the murder" because she informed police about the prior incident when she was notified of Victim's death. ***Id.*** at 10. Appellant avers "the jury was deprived of evidence of motive as to who would want to harm" Victim. Appellant's Brief at 11. We conclude no relief is due.

> We note the relevant standard of review:
>
> When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal "unless that ruling reflects 'manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.'"

***Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa. Super. 2010) (citations omitted).

---

[7] As we discuss ***infra***, there is no reference to a "Meco Brown" in the motion *in limine* hearing transcript. Furthermore, Owens' first name is spelled as "Zach" in the transcript. ***See*** N.T. Motion *in Limine* at 11.

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Pennsylvania Rule of Evidence 401 defines "relevant" evidence as follows:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401(a)-(b).

Here, the trial court reasoned as follows:

[A]fter Victim's death, Victim's wife informed the police that their residence had been shot at[,] about three (3) to four (4) months before Victim's death. No one reported this incident to the police and **there were no names attached to who shot at the house**. A police report states a Mr. Crawford told police that the Victim was having issues with an individual and that individual had recently shot at Victim. On the other hand, **Mr. Crawford did not name this individual and did not specifically state if he was referring to the shooting that occurred at Victim's residence three (3) to four (4) months prior.** Additionally, Mr. Crawford stated that Victim was having problems with a Zach Owens. Nevertheless, **Mr. Crawford did not state that Mr. Owens was the individual who recently shot at Victim. There is nothing that ties Mr. Owens or any name to the shooting** that occurred three (3) to four (4) months prior at Victim's residence. Moreover, **there was no evidence** presented **that the shooting at Victim's residence was targeting Victim and not Victim's wife** since the two shared the residence.

Trial Ct. Op. at 19-20 (emphases added and record citations omitted)).

After a careful review of the Commonwealth's motion *in limine* and the June 5, 2019, transcript of the hearing, we agree with the trial court's summation of the evidence, or rather lack of evidence. Appellant's assertion

- 13 -

— that Zack Owens and Meco Brown "were identified as suspects" — is wholly unsupported by the record. **See** Appellant's Brief at 10. First, there was no reference to a "Meco Brown" in the Commonwealth's motion *in limine* or the hearing transcript. Additionally, the transcript page cited by Appellant, page 11, merely includes Appellant's counsel's own speculation that an **unnamed**-person may be connected to the gunshots at Victim's house. **See** N.T. Motion *in Limine*, at 9 ("I don't know if [Crawford is] referring specifically to this event, although it certainly appears to be."). Similarly, we discern no record support for Appellant's other two factual premises — that Victim's "wife obviously believed there was a connection between the prior incident and the murder" and it was "more probable that [Victim] was killed by the individual[s] who shot up his house." **See** Appellant's Brief at 10-11. Indeed, without any further explanation as to where this evidence appeared in the record, these statements appear to be merely counsel's conjecture.

For the foregoing reasons, we conclude the trial court did not abuse its discretion in precluding, as not relevant, evidence or reference to the gunshots fired at Victim's home, three to four months before his fatal shooting. **See** Pa.R.E. 401(a)-(b); **Minich**, 4 A.3d at 1068.

Appellant's second claim on appeal is that the evidence was insufficient to sustain his murder conviction. After citing relevant authority, Appellant's sole discussion of the evidence presented in the instant matter is:

> The Commonwealth's case against Appellant rested solely on circumstantial evidence. . . .

- 14 -

* * *

In the case at bar, the evidence was insufficient to prove beyond a reasonable doubt that Appellant was guilty of first - degree murder and [the firearms offenses].  There were no eyewitnesses and no direct evidence that Appellant shot the victim.  The Commonwealth's case against . . . Appellant was highly circumstantial and, according to the Commonwealth's witnesses, . . . Appellant did not have a firearm nor any blood on his clothes after the murder.  [N.T. Jury Trial, Day 4, 6/14/19, at 124-25.]  Moreover, there was insufficient evidence to prove beyond a reasonable doubt that Appellant was in possession of a firearm on June 23, 2018.  [*Id.* at 124.]

Appellant's Brief at 16, 17.  We conclude no relief is due.

We are guided by these principles:

When examining a challenge to the sufficiency of the evidence:

[t]he standard we apply . . . is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  **Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.**  Moreover, in applying the above test, **the entire record must be evaluated and all evidence actually received must be considered.**  Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

- 15 -

"This standard is equally applicable in cases where the evidence is circumstantial, rather than direct, provided that the combination of evidence links the accused to the crime beyond a reasonable doubt."

*Commonwealth v. Orr*, 38 A.3d 868, 872-73 (Pa. Super. 2011) (*en banc*)

(citations omitted).

The Pennsylvania Supreme Court has explained:

Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that a human being was unlawfully killed; that the accused is responsible for the killing; and that the accused acted with specific intent. 18 Pa.C.S. § 2502(a)[.] An intentional killing is a "killing by means of poison, or by lying in wait, or any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth can prove this specific intent to kill from circumstantial evidence.

*Commonwealth v. Tharp*, 830 A.2d 519, 523-24 (Pa. 2003) (some citations omitted). "[I]t is axiomatic that '[s]pecific intent to kill **may** be inferred from the use of a deadly weapon on a vital part of the victim's body.'"

*Commonwealth v. Predmore*, 199 A.3d 925, 931 (Pa. Super. 2018) (*en banc*).

The trial court addressed Appellant's sufficiency claim as follows:

Here, the evidence at trial viewed in the light most favorable to the Commonwealth was sufficient to sustain Appellant's conviction for first-degree homicide. Even though there was no direct evidence, an enormous amount of circumstantial evidence was presented at trial to secure Appellant's jury conviction.

Trial Ct. Op. at 27. We agree.

Shorts, Abram, and Wiley testified they were hanging out with

Appellant and Victim at TnT Bar on the night of the shooting. While

- 16 -

Abram was "rap battling" with Appellant, Appellant lifted his shirt "to expose a dark object" in his "waist area." Trial Ct. Op. at 8. Captain Martwinski testified that surveillance video from the bar showed "Appellant was exhibiting . . . signs of printing," or concealing a weapon on his person. *Id.* at 9. Wiley testified that he and Appellant entered Victim's car, who was giving him a ride home. *Id.* at 8. When Wiley exited the car, Appellant entered the front seat. *Id.* at 9.

Surveillance video from the bar, the library, and a dry-cleaning store showed Victim's car travelling at 2:30, 2:31, and 2:39 a.m., respectively. Trial Ct. Op. at 9-10. Volpe — a neighbor of Appellant's aunt, West — testified that he was awakened by three or four gunshots at 2:42 a.m. *Id.* at 4. In his 911 call, he "stated he heard voices arguing before the gunshots went off." *Id.* Meanwhile, Bell — West's boyfriend — heard two gunshots, and after going upstairs to check on West and her son, Appellant knocked on his door. *Id.* at 5. West observed Appellant remove his clothes and place them in the washing machine, with detergent and bleach. *Id.* at 6. Appellant then went to West's attic, where he "could look directly at the crime scene below." *Id.* Finally, we reiterate Victim sustained multiple gunshots to his face, a vital part of his body. *See id.* at 4.

Viewing all the evidence in the light most favorable to the Commonwealth, we agree with the trial court there was sufficient

circumstantial evidence to enable the jury to find every element of murder in the first degree beyond a reasonable doubt. **See** 18 Pa.C.S. § 2502(a); **Orr**, 38 A.3d at 872. Contrary to Appellant's claim, we conclude the "combination of" all the circumstantial evidence linked him to the murder of Victim beyond a reasonable doubt. **See Orr**, 38 A.3d at 873. To the extent Appellant avers this Court vacate the jury's factual findings and reweigh the evidence, we cannot do so. **See id.** at 872-73. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/2021